UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**CARMELA MAGNETTI,**

Petitioner,

- <em>against</em> -

**ANGINELL ANDREWS,** Superintendent,
Albion Correctional Facility,

Respondent.

12 Civ. 0150 (VB) (PED)

**<u>REPORT AND
RECOMMENDATION</u>**

TO THE HONORABLE VINCENT BRICCETTI, UNITED STATES DISTRICT JUDGE:

## I. <u>INTRODUCTION</u>

On August 29, 2008, a Westchester County jury convicted petitioner Carmela Magnetti ("petitioner" or "defendant") of one count of hindering prosecution in the first degree (N.Y. Penal Law § 205.65) and one count of tampering with physical evidence (N.Y. Penal Law § 215.40).[1]  Petitioner's conviction stemmed from the murder of Patricia Mery by her daughter (and petitioner's friend) Anne Trovato in Ossining, New York on or about May 11, 2006.[2] Petitioner was  sentenced on December 2, 2008 to concurrent, indeterminate terms of imprisonment of two and one-half to seven years (hindering prosecution) and one and one-half

---

[1] Petitioner was acquitted of one count of second degree criminal facilitation (N.Y. Penal Law § 115.05).

[2] Law enforcement officials believe the murder occurred three days before Patricia Mery's body was discovered in the living room of her home on May 14, 2006.  Investigators at the scene observed several plastic bags covering Mrs. Mery's head, evidence of blunt force trauma, multiple stab wounds and a baseball bat and large steak knife on the floor near the body.

1

to four years (tampering with evidence).  She was released to parole from Taconic Correctional Facility on or about July 26, 2013.[3]

Presently before this Court is petitioner's *pro se* Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  This petition is before me pursuant to an Order of Reference dated March 23, 2012  (Dkt. #7).  For the reasons set forth below, I respectfully recommend that Your Honor deny the petition in its entirety.

## II.  BACKGROUND[4]

### A.     Police Investigation and Petitioner's Arrest

Petitioner and her mother, Gloria Magnetti, became friends with Anne Trovato and her mother, Patricia Mery, in 2004.  At that time, Trovato and her young daughter lived with Mery in her house in Ossining.  As petitioner's friendship with Trovato grew closer, Trovato's relationship with Mery worsened.  In November 2005, Trovato and her daughter moved out of Mery's house and into the house where petitioner lived with her mother, which caused a rift between Mery and the Magnettis.  Mery changed the locks and would not allow Trovato to retrieve her or her daughter's things; Trovato would not allow Mery to see her granddaughter.  In February 2006, Mery filed a petition in Family Court seeking joint custody or, alternatively, visitation rights.  Mery was granted supervised visitation with her granddaughter, to take place once a week beginning April 25, 2006.  On April 28, 2006, Mery noticed that the brakes on her

---

[3] Petitioner failed to notify the Court of either her transfer from Albion Correctional Facility or her release.

[4] Unless otherwise indicated, the information within this section is gleaned from the instant petition (Dkt. #1), respondent's Affidavit in Opposition to Petition for a Writ of *Habeas Corpus* ("Resp. Aff.") (Dkt. #8) and respondent's Memorandum of Law and Exhibits ("Resp. Opp.") (Dkt. #9).

car were not functioning properly and drove the car to a repair shop. The mechanic determined that the brake lines had been cut. Mery reported this incident to the police. On Sunday, May 14, 2006, Mery's relatives called Ossining police because they had not heard from Mery. Michael Mery, Patricia Mery's brother, entered Mery's house with the police and discovered his sister's body.

Later that day, Gloria Magnetti learned of Mery's murder and immediately called Investigator Peter Becerra of the Westchester County District Attorney's Office ("the DA's Office"). Gloria knew Becerra because Gloria was a victim/cooperating witness in an unrelated loansharking case that Becerra began investigating on May 6, 2006. Becerra knew nothing about Mery's murder until Gloria's phone call, but immediately thereafter he became involved in the investigation due to his familiarity with Gloria and her family. On the evening of May 14, 2006, after Becerra spoke with Gloria, petitioner went to the Ossining Village Police Department where she was questioned by investigators. She told the officers she had been shopping with Trovato and her daughter at the Galleria Mall between 2:00 p.m. and 8:00 p.m. on May 11, 2006.

On the evening of May 17, 2006, petitioner and her mother returned to the Ossining Police Department. Officers confronted petitioner with surveillance video from the Galleria mall on May 11, 2006 which showed her shopping alone. Petitioner became upset and told the officers that, on the afternoon of Mery's murder, petitioner dropped Trovato off near Mery's house so that Trovato could search for a white Jeep Cherokee that had allegedly egged petitioner's car. Petitioner claimed she went to the Galleria without Trovato and returned to Ossining later that evening to pick her up in response to Trovato's frantic phone calls. Petitioner stated she picked Trovato up on Stormytown Road, that Trovato was upset but petitioner did not know why and that Trovato was carrying a white bag. Petitioner signed a statement to this

3

effect.

Between May 19th and July 30th, Investigator Becerra and Detective Reddy telephoned petitioner numerous times and attempted to persuade her to cooperate with authorities and provide evidence against Trovato, but petitioner maintained that Trovato was not the killer and named other possible suspects, including Mery's brother, Michael.  Following those phone calls and several more meetings with various law enforcement officials, petitioner met Becerra at the Pleasantville Diner on the afternoon of July 30, 2006 and provided a detailed account of her actions and Trovato's inculpatory statements on the night of May 11, 2006.  Investigator Becerra surreptitiously recorded petitioner's recitation of events.  Resp. Opp. Exh. N.  Specifically, petitioner told Becerra the following:

Petitioner was shopping at the Galleria mall when she received a phone call from Trovato, who sounded hysterical.  Id. at 35.  Petitioner picked her up on Stormytown Road and Trovato was very upset and breathing heavily.  Id. at 35, 41.  Petitioner asked what happened and Trovato said "I don't know what happened.  I don't know what I did."  Id.  When they arrived home petitioner asked again, and Trovato said she and her mother had gotten into a heated confrontation, Trovato hit her mother with a bat, one of them grabbed a knife, they struggled, Trovato blacked out and woke up on the floor next to her mother.  Id. at 35-36.  Trovato was carrying a bag containing her bloody clothes and had washed her hands "and stuff" in the sink in her mother's house.  Id. at 45, 48.  Petitioner and Trovato told Artie Walsh (petitioner's cousin) what happened, and Artie told them they had to get rid of the bag of clothes.  Id. at 45-46.[5]  Petitioner drove to Hartsdale and threw Trovato's bag of clothes into a

---

[5]  Artie Walsh was living at Gloria's house and was home when petitioner and Trovato arrived.

condominium development's dumpster.  Id. at 46-48.

During the July 30th meeting, Becerra unsuccessfully attempted to persuade petitioner to provide him with a written statement memorializing her oral statement.  Immediately following the meeting, Becerra called Gloria Magnetti and attempted to persuade her to advise petitioner to provide Becerra with a written statement memorializing what she stated at the diner.  Over the next two days, Becerra called petitioner several times and pressed her to provide a written statement but she did not.  Petitioner was arrested on August 2, 2006 and immediately retained counsel (William Fleming, Esq.).[6]  Petitioner telephoned Becerra from police headquarters on August 2, 2006, but Becerra informed petitioner that he could not speak to her without her counsel present.  It appears that all direct contact between Becerra and petitioner ceased as of that moment.

**B.**     **Becerra's Contact with Gloria Magnetti**

After petitioner obtained counsel, Becerra contacted Gloria Magnetti numerous times (in person and via telephone) over the course of eleven months and attempted to enlist her help to pressure her daughter to provide evidence against Trovato in exchange for a plea bargain.  Gloria began tape recording her conversations with Becerra when she realized his conduct may have been improper.

On August 8, 2006, petitioner's counsel met with members of the DA's Office to discuss the possibility of petitioner's cooperation in the prosecution of Trovato.[7]  During the meeting,

_____

[6]  On or about August 8, 2006, petitioner also retained the services of co-counsel Geoffrey Orlando, Esq.

[7]  On August 4, 2006, upon the filing of a felony complaint in Ossining Village Court, Trovato was charged with second degree murder.  Petitioner did not cooperate.  On September 26, 2006 she was indicted on charges of second degree criminal facilitation, first degree hindering prosecution and tampering with physical evidence.

5

Mr. Orlando advised Assistant District Attorney Patricia Murphy that he was concerned about information conveyed to him by Gloria Magnetti, *to wit*, that Becerra made disparaging remarks to Gloria about Mr. Fleming's general competence and the level of his commitment to his representation of petitioner.  The DA's Office took no action in response to Mr. Orlando's complaint.  On June 22, 2007, Mr. Orlando met with Assistant District Attorneys Murphy and James McCarty, advised them in detail of Becerra's ongoing contact with Gloria Magnetti, provided them with four tapes of the calls between Becerra and Gloria and asked them to take appropriate action.  On or about June 27, 2007, Becerra's superiors in the DA's Office directed him to cease contact with Gloria Magnetti; Becerra immediately complied.

On August 21, 2007, petitioner's counsel made an application before the Supreme Court, Westchester County (Molea, J.) to be relieved as counsel on the ground that Becerra's conversations with Gloria Magnetti over the course of the previous year had irreparably undermined petitioner's confidence in their ability to represent her.  See Resp. Opp., Exh. B, at 3-6.[8]  Judge Molea ascertained petitioner's understanding of counsel's application and her agreement thereto, and noted petitioner's right to change retained counsel at any time for any reason.  Id. at 4-6, 10.  Thus, Judge Molea granted counsel's application and, upon petitioner's representation that she could not afford an attorney, appointed Ted Brundage, Esq. to represent her.  Id. at 6-7, 11.

## C.  Motion to Dismiss the Indictment

On or about October 24, 2007, petitioner's new counsel moved to dismiss the indictment

---

[8]  Hereinafter, all citations to "Exh. ___" refer to exhibits found in Respondent's Record of Exhibits.

in furtherance of justice pursuant to New York Criminal Procedure Law ("CPL") § 210.40,[9] on

the grounds that Investigator Becerra's attempts to pressure Gloria Magnetti to convince her

daughter to provide inculpatory evidence against Trovato constituted egregious misconduct

which interfered with petitioner's Sixth Amendment right to counsel.  See Exh. C.  In support of

said motion, petitioner submitted five audiotapes made by Gloria Magnetti of her conversations

with Investigator Becerra.  See Exh. E at 1, 8 n.11.  By Decision and Order entered January 29,

2008, the Westchester County Supreme Court (Molea, J.) made the following findings of fact:

From May 14, 2006 through June 26, 2007, Investigator Becerra and Gloria Magnetti

engaged in approximately 409 conversations.  Id. at 2 n.1.  Those conversations were in

furtherance of Becerra's "persistent campaign of telephone and personal communications with

Gloria Magnetti . . . in an attempt to utilize her to persuade her daughter to cooperate with the

People in their prosecution of her co-defendant by agreeing to testify against her at trial in

exchange for a plea bargain."  Id. at 8.  Becerra attempted to gain Gloria's cooperation "by

repeatedly advising her, in substance, that she should trust him, that he considered her his friend,

that he is being truthful with her and that he was only speaking with her because he feels badly

for her and the defendant and their family."  Id. at 8-9.  Becerra, knowing that Gloria and her

husband paid for petitioner's retained counsel, told Gloria that she should not listen to the

retained attorneys and that "they will lie to her, that one of the attorneys is a 'fat bastard' and

that she had 'to be crazy for paying that f**k.'"  Id. at 9-10.  Further, Becerra "made disparaging

remarks concerning the trial preparation strategies and tactics being employed by the defendant's

---

[9]  Pursuant to CPL §210.40, a court may dismiss an otherwise valid indictment in the
interest of justice when "such dismissal is required as a matter of judicial discretion by the
existence of some compelling factor, consideration or circumstance clearly demonstrating that
conviction or prosecution of the defendant upon such indictment . . . would constitute or result in
injustice."  See Exh. E at 14.

attorneys," and told Gloria that the attorneys were "purposely dragging the case out in order to garner additional fees." Id. at 10. Becerra advised Gloria "that she should threaten to withhold further fee payments to the defendant's attorneys unless the defendant agreed to cooperate with the district Attorney's Office, thereby forcing the defendant to seek the appointment of counsel through what he call[ed] 'legal aid.'" Id. In response to Becerra's efforts, Gloria agreed to try and persuade petitioner to provide a hair sample for DNA testing, to turn over photographs of Trovato and "to cooperate with the People and testify against her co-defendant at trial in exchange for a plea bargain." Id. at 11. Petitioner's attorneys admonished Gloria not to speak to Becerra but Gloria continued to do so, and told petitioner she should cooperate with the People because Becerra was the only one Gloria trusted. Id.

Judge Molea weighed these facts in the context of the statutorily enumerated factors set forth in CPL 210.40[10] and declined to dismiss the indictment. Id. at 19. Specifically, in

---

[10] "In determining whether such compelling factor, consideration, or circumstance exists [which would warrant dismissal of the indictment], the court must, to the extent applicable, examine and consider, individually and collectively, the following:

    (a) the seriousness and circumstances of the offense;
    (b) the extent of harm caused by the offense;
    (c) the evidence of guilt, whether admissible or inadmissible at trial;
    (d) the history, character and condition of the defendant;
    (e) any exceptionally serious misconduct of law enforcement personnel in the investigation, arrest and prosecution of the defendant;
    (f) the purpose and effect of imposing upon the defendant a sentence authorized for the offense;
    (g) the impact of a dismissal upon the confidence of the public in the criminal justice system;
    (h) the impact of a dismissal on the safety of welfare of the community;
    (i) where the court deems it appropriate, the attitude of the complainant or victim with respect to the motion;
    (j) any other relevant fact indicating that a judgment of conviction would serve no useful purpose.
N.Y. C.P.L §210.40 (1).

8

considering whether Becerra engaged in "exceptionally serious misconduct," N.Y. C.P.L. §210.40(1)(e), the court noted that petitioner "was being represented by retained counsel throughout the entire period during which her mother was being improperly influenced" by Becerra, that petitioner refused to cooperate with the People despite Becerra's "persistent campaign of manipulative persuasion" and that petitioner did not submit an affidavit supporting her claim that Becerra poisoned her relationship with her retained counsel.  Exh. E at 16.  The court further noted that, even assuming the truth of said claim, petitioner "has not been without competent representation for any period of time as a result of the dissolution of that relationship."  Id. at 16-17.  Thus, the court stated it was unable "to identify any resultant prejudice flowing from the actions of Investigator Becerra" to petitioner.  Id. at 17.  Judge Molea concluded:

> while the actions of Investigator Becerra are undeniably inappropriate and objectionable, as they did not result in any founded violation of the defendant's constitutional rights nor in any other form of demonstrated prejudice to the defendant, they are not sufficient to warrant the dismissal of the instant indictment in the interest of justice pursuant to CPL 210.40 upon consideration of the facts of this case.

Id.

**D.     Motion in Limine**

    Two of the crimes with which petitioner was charged (second degree criminal facilitation and first degree hindering prosecution)[11] required the People to prove, as an element of the

---

[11] "A person is guilty of criminal facilitation in the second degree when, believing it probable that he is rendering aid to a person who intends to commit a class A felony, he engages in conduct which provides such person with means or opportunity for the commission thereof and which in fact aids such person to commit such class A felony."  N.Y. Penal Law § 115.05. "A person is guilty of hindering prosecution in the first degree when he renders criminal assistance to a person who has committed a class A felony, knowing or believing that such person has engaged in conduct constituting a class A felony."  N.Y. Penal Law § 205.65.

crimes, that Trovato committed a Class A felony, *to wit*, that she murdered Patricia Mery.  <u>See</u>
<u>People v. Chico</u>, 90 N.Y.2d 585, 588 (1997) (conviction of first degree hindering prosecution
requires proof of each element of the alleged underlying class A felony); <u>People v. Mahboubian</u>,
519 N.Y.S.2d 619, 622 n.5 (N.Y. Sup. 1987) ("Conviction for criminal facilitation requires that
the object crime be completed.").  On or about April 30, 2008, petitioner's counsel submitted a
motion in limine seeking to preclude the prosecution from presenting crime scene evidence in
exchange for petitioner's stipulation that Anne Trovato was convicted of the predicate
homicide.[12]  <u>See</u> Exh. F.  In support of her application, petitioner argued–in light of the offered
stipulation–that crime scene evidence would be inflammatory and intentionally more prejudicial
than probative.  <u>Id.</u>, Affirmation, at 3-4.  The prosecution orally opposed said motion at the
conclusion of pretrial hearings held May 1-7, 2008.[13]  <u>See</u> Transcript of Hearings Before Trial
("Hearing Transcript"), at 377-380.  The People noted, however, that the parties "were trying to
work out some stipulations" concerning the forensic evidence.  <u>Id.</u> at 378-79.  The following
colloquy then occurred:

> THE COURT:  But Mr. Brundage, just as a principle, the Court can't order the People to
> agree on how to try a case.  I'm going to have to take your objections one by one, unless you two
> work out ahead of time really what is prejudicial to your client.

> MR. BRUNDAGE:  Judge, that's fine.  Judge, I mean in all candor, I was looking to
> knock out all the forensics.  I appreciate Your Honor is not inclined to do that and together with

---

[12] On October 22, 2007, a jury convicted Anne Trovato of the intentional murder of her
mother, Patricia Mery.

[13] Prior to trial, petitioner requested and was granted a hearing pursuant to <u>People v.</u>
<u>Huntley</u>, 15 N.Y.2d 72 (1965), whereby she sought to suppress various statements including
those she made to Becerra during their July 30th meeting at the Pleasantville Diner.  At the
conclusion of the hearing, the trial court denied petitioner's motion to suppress on the ground
that "none of the statements [were] a product of custodial interrogation."  Hearing Transcript at
229.

Mr. Ward and Miss Hochheiser we have already hammered out I think 12 stips and principles so we'll continue to do that. I mean, obviously I like to knock the whole thing out. If you rule that I can't do that then –

    THE COURT: I can't order them –

    MR. BRUNDAGE: I understand.

    THE COURT: – to agree to a stipulation and I wouldn't order you to agree to a stipulation.

    MR. BRUNDAGE: Understood, Judge.

    THE COURT: You both have a job to do for your respective clients and I don't tell lawyers how to try their case.

    MR. BRUNDAGE: That's fine.

    THE COURT: And if there is something in particular that's of concern to you, you should object to it when we put it on another time and we can talk about it further. And if it has to be ruled on, it will be ruled on.

    MR. BRUNDAGE: Very well, Judge.

Id. at 380-82. Ultimately, the parties entered into several stipulations regarding forensic evidence (T. 2067-71).[14]

## E.    **Evidentiary Issue at Trial: Audiotapes**

    During cross-examination of Investigator Becerra, petitioner's counsel alerted the court that he wished to put before the jury the issue of the voluntariness of the statements petitioner made to Becerra during their meeting on July 30, 2006 at the Pleasantville Diner (T. 1501-03). The court granted petitioner's counsel leave to demonstrate a basis for recalling Becerra (T. 1503). Subsequently, when the court took up the issue again, petitioner's counsel sought to introduce the audiotapes of conversations between Becerra and Gloria Magnetti as evidence that Becerra coerced petitioner's July 30th statements (T. 1872-74). The prosecution argued that the

---

[14] Numbers in parentheses preceded by "T." refer to pages from the trial transcript.

audiotapes were irrelevant because none of them were made prior to July 30, 2006 (T. 1874). Defense counsel conceded that all of the tapes were made post-July 30, 2006, but argued that Becerra's coercive conduct began prior to July 30, 2006 and that Gloria Magnetti would testify "that the same thing that [Becerra] was doing before is what he did on the tapes, and the reason that she started taping is, she spoke to people and they said, listen, if that's what he's doing, tape him. Start taping him." (T. 1870, 1874). The trial court precluded admission of the tapes on the ground that "the post July 30th tapes [were] not relevant to the coercion before July 30th." (T. 1874-75). However, the trial court allowed defense counsel to recall Becerra and question him about his conversations with Gloria Magnetti, provided defense counsel "connect[ed] it from Gloria to the defendant." (T. 1876). The trial court also held that if Gloria Magnetti "had a campaign of telling her daughter to cooperate" with the prosecution, she would be allowed to testify to that effect (T. 1879).

Petitioner's counsel recalled Becerra and questioned him about his conversations with Gloria Magnetti (T. 1988-98). Becerra testified that, between May 14, 2006 and July 30, 2006, he and Gloria spoke "[p]robably maybe every other day. Maybe two times in one day." (T. 1990). Petitioner's counsel asked Becerra a number of questions about the substance of said conversations; Becerra denied telling Gloria that her daughter did not need an attorney and that, if her daughter did not come in and speak to law enforcement, the whole Magnetti family would "go down." (T. 1995).

Gloria Magnetti was called as a defense witness (T. 2491), and testified as follows regarding the conversations she had with Investigator Becerra between May 14, 2006 and July 30, 2006:

On May 14, 2006, when Gloria learned of Patricia Mery's murder, she called Investigator

12

Becerra to get more information (T. 2512-13). They spoke again the next day and, on May 17, 2006, Becerra arranged a meeting between Ossining police and Gloria and Carmela (T. 2525). Between May 14, 2006 and July 30, 2006, Gloria discussed the Mery case with Becerra "[e]very day, practically. Every day whenever [Gloria] called. Periodically, every day." (T. 2526). Becerra told Gloria

> to bring her [petitioner] in, that he wanted to help her. That this was, like, she knew things, or he was, like, arguing with me to get her to come in to say things. I said, I don't know what she knows. I was trying to tell him what my nephew was saying to me, and he was saying, don't listen to him, and make sure you tell your daughter this, this and that. He would give me different scenarios of what would happen to her, and he was telling me bits and pieces of the case itself, which I didn't even know anything about, like, what happened.

(T. 2527-28). For instance, Becerra told Gloria to tell petitioner "we know where the clothes are" and see the reaction on her face (T. 2531). Becerra wanted Gloria to "find out what she [could] get" from petitioner and "report it back to him" (T. 2529-30). Gloria conveyed the substance of "most of " her conversations with Becerra to her daughter (T. 2530, 2540, 2647). Gloria repeatedly told Becerra that petitioner maintained that she did not know anything about Patricia Mery's murder (T. 2544). Becerra told Gloria that petitioner did not need an attorney ("he said, all they do is take your money, they're expensive, and you don't need any") and Gloria conveyed this information to petitioner on more than one occasion (T. 2536-37).

**F.    <u>Direct Appeal</u>**

Petitioner (by and through counsel) timely appealed her conviction to the Appellate Division, Second Department on the following grounds: (1) petitioner's Sixth Amendment right to counsel was violated by Investigator Becerra's use of Gloria Magnetti as an agent for the purpose of undermining petitioner's attorney-client relationship (Exh. G, at 23-34); (2) the indictment should be dismissed in furtherance of justice pursuant to CPL § 210.40 (<u>id.</u> at 35-40);

(3) the trial court erred when it refused to admit into evidence the audiotapes of Gloria

Magnetti's conversations with Investigator Becerra (id. at 41-46); (4) in light of petitioner's

willingness to concede that Anne Trovato committed second degree murder, the trial court

should have granted petitioner's motion in limine and precluded crime scene evidence (id. at 47-

53); and (5) petitioner's sentence was harsh and excessive (id. at 54-60).  By Decision and Order

dated November 9, 2010, the Second Department affirmed petitioner's judgment of conviction.

People v. Magnetti, 78 A.D.3d 863, 910 N.Y.S.2d 367 (2d Dep't 2010).  Petitioner, by and

through counsel, timely submitted an application for leave to appeal to the New York Court of

Appeals, wherein she sought review of all of the claims raised in her appellate brief (Exh. J).

The Court of Appeals denied petitioner leave to appeal on June 23, 2011.  People v. Magnetti, 17

N.Y.3d 798, 952 N.E.2d 1101, 929 N.Y.S.2d 106 (2011).  Petitioner did not seek a writ of

*certiorari* to the United States Supreme Court.

**G.      The Instant Petition**

     Petitioner timely[15] filed the instant Petition for a Writ of Habeas Corpus on or about

December 28, 2011,[16] wherein she seeks habeas review of three of the claims she raised on direct

appeal: (1) petitioner's Sixth Amendment right to counsel of her choice was violated as a result

of Investigator Becerra's interactions with Gloria Magnetti; (2) the trial court erred in refusing to

admit into evidence the audiotapes of Investigator Becerra's conversations with Gloria Magnetti;

and (3) the trial court should have granted petitioner's motion in limine and precluded the crime

scene evidence.

---

[15]  See 28 U.S.C. § 2244(d)(1).

[16]  The date on which petitioner placed the instant Petition in the prison mailing system.
See Noble v. Kelly, 246 F.3d 93, 97 (2d Cir. 2001) (extending the "mailbox rule," Houston v.
Lack, 487 U.S. 266 (1988), to *pro se* petitions for habeas relief).

### III. DISCUSSION

**A.**      **Applicable Law**

"Habeas review is an extraordinary remedy." <u>Bousley v. United States</u>, 523 U.S. 614,

621 (1998) (<u>citing</u> <u>Reed v. Farley</u>, 512 U.S. 339, 354 (1994)).  Before a federal district court may

review the merits of a state criminal judgment in a habeas corpus action, the court must first

determine whether the petitioner has complied with the procedural requirements set forth in 28

U.S.C. §§ 2244 and 2254.  If there has been procedural compliance with these statutes, the court

must then determine the appropriate standard of review applicable to the petitioner's claim(s) in

accordance with  § 2254(d).  The procedural and substantive standards applicable to habeas

review, which were substantially modified by the Anti-Terrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), are summarized below.

1. *Timeliness*

AEDPA established a one-year statute of limitations for the filing of a habeas corpus

petition seeking relief from a state court conviction.  <u>See</u> 28 U.S.C. § 2244(d)(1).  The one-year

limitation period runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or
> the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by State action in
> violation of the Constitution or laws of the United States is removed, if the applicant was
> prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially recognized by the
> Supreme Court, if the right has been newly recognized by the Supreme Court and made
> retroactively applicable to cases on collateral review; or
> (D) the date on which the factual predicate of the claim or claims presented could have
> been discovered through the exercise of due diligence.

<u>Id.</u>

AEDPA's statute of limitations is tolled during the pendency of a properly filed

application for state post-conviction relief, or other collateral review, of a claim raised in the petition. See id. § 2244(d)(2). The one-year limitation period is also subject to equitable tolling, which is warranted when a petitioner has shown "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." Holland v. Florida, 130 S. Ct. 2549, 2562 (2010) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)). In the Second Circuit, equitable tolling is confined to "rare and exceptional circumstance[s]," Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000) (per curiam) (internal quotation marks omitted), which have "prevented [the petitioner] from filing his petition on time," Valverde v. Stinson, 224 F.3d 129, 134 (2d Cir. 2000) (internal quotation marks and emphasis omitted). The applicant for equitable tolling must "demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances." Id.

    2.    *Exhaustion*

A federal court may not grant habeas relief unless the petitioner has first exhausted his claims in state court. O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); see 28 U.S.C. § 2254(b)(1) ("[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that – (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(I) there is an absence of available corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant"); id. § 2254(c) (the petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right

under the law of the State to raise, by any available procedure, the question presented").  The exhaustion requirement promotes interests in comity and federalism by demanding that state courts have the first opportunity to decide a petitioner's claims.  Rose v. Lundy, 455 U.S. 509, 518-19 (1982).

To exhaust a federal claim, the petitioner must have "fairly present[ed] his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim," and thus "giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  Baldwin v. Reese, 541 U.S. 27, 29 (2004) (internal quotation marks and citations omitted).  "Because non-constitutional claims are not cognizable in federal habeas corpus proceedings, a habeas petition must put state courts on notice that they are to decide federal constitutional claims."  Petrucelli v. Coombe, 735 F.2d 684, 687 (2d Cir. 1984) (citing Smith v. Phillips, 455 U.S. 209, 221 (1982)).  Such notice requires that the petitioner "apprise the highest state court of both the factual and legal premises of the federal claims ultimately asserted in the habeas petition."  Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005) (internal citation omitted).  The Second Circuit has delineated a number of ways in which a petitioner may fairly apprise the state court of the constitutional nature of his claim, even without citing chapter and verse of the Constitution, including: "a) reliance on pertinent federal cases employing constitutional analysis, b) reliance on state cases employing constitutional analysis in like fact situations, c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation."  Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011) (internal quotation marks and citation omitted).  A habeas petitioner who fails to meet a state's requirements to exhaust a claim

17

will be barred from asserting that claim in federal court.  Edwards v. Carpenter, 529 U.S. 446, 451 (2000).

However, "[f]or exhaustion purposes, a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred."  Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997) (internal quotation omitted).  "In such a case, a petitioner no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. § 2254(b)."  Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991).  Such a procedurally barred claim may be deemed exhausted by a federal habeas court.  See, e.g., Reyes, 118 F.3d at 139.  However, absent a showing of either "cause for the procedural default and prejudice attributable thereto," Harris v. Reed, 489 U.S. 255, 262 (1989), or "actual innocence," Schlup v. Delo, 513 U.S. 298 (1995), the petitioner's claim will remain unreviewable by a federal court.

Finally, notwithstanding the procedure described above, a federal court may yet exercise its discretion to review and deny a mixed petition containing both exhausted and unexhausted claims, if those unexhausted claims are "plainly meritless."  Rhines v. Weber, 544 U.S. 269, 277 (2005); see 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); Padilla v. Keane, 331 F. Supp.2d 209, 216 (S.D.N.Y. 2004) (interests in judicial economy warrant the dismissal of meritless, unexhausted claims).

    3.    *Procedural Default*

Federal habeas corpus review of a state court's denial of a state prisoner's federal constitutional claim is barred if the state court's decision rests on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause for the procedural default

and actual prejudice resulting from the alleged constitutional violation, or show "that failure to consider the claims will result in a fundamental miscarriage of justice." See <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991). See also <u>Lee v. Kemna</u>, 534 U.S. 362, 375 (2002); <u>Dunham v. Travis</u>, 313 F.3d 724, 729 (2d Cir. 2002). A procedural ground is "independent" if "the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." See <u>Harris</u>, 489 U.S. at 263 (internal quotation marks omitted). A procedural bar is "adequate" if it is "based on a rule that is firmly established and regularly followed by the state in question." <u>Monroe v. Kuhlman</u>, 433 F.3d 236, 241 (2d Cir. 2006) (internal quotation and citation omitted).

In certain limited circumstances, however, "even firmly established and regularly followed state rules will not foreclose review of a federal claim if the application of the rule in a particular case is 'exorbitant.'" See <u>Garvey v. Duncan</u>, 485 F.3d 709, 713-14 (2d Cir. 2007) (citing <u>Lee</u>, 534 U.S. at 376). The Second Circuit has set forth the following "guideposts" for evaluating the adequacy of the state procedural bar in the context of "the specific circumstances presented in the case, an inquiry that includes an evaluation of the asserted state interest in applying the procedural rule in such circumstances":

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

<u>Cotto v. Herbert</u>, 331 F.3d 217, 240 (2d Cir. 2003) (quoting <u>Lee</u>, 534 U.S. at 381-85).

4. *Standard of Review*

"[I]t is not the province of a federal habeas court to reexamine state-court determinations

on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 502 U.S. 62, 68 (1991).  See 28 U.S.C. § 2254(a).  When reviewing petitions filed subsequent to AEDPA's effective date, a federal court may not grant habeas relief unless the petitioner establishes that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1), (d)(2).  The AEDPA deferential standard of review will be triggered if the petitioner's claim "was adjudicated on the merits in State court proceedings."  28 U.S.C. § 2254(d); see Bell v. Miller, 500 F.3d 149, 154–55 (2d Cir. 2007).  "For the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment."   Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001).

A state court's decision is "contrary to" clearly established Federal law if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme Court of the United States] on a question of law" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that reached by the Supreme Court of the United States]."  Williams v. Taylor, 529 U.S. 362, 405 (2000).  As to the "unreasonable application" prong, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A state court decision involves an "unreasonable application" of Federal Supreme Court precedent if (1) "the state court identifies

20

the correct legal rule from [Federal Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or (2) "the state court either unreasonably extends a legal principle from [Federal Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407. However, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011) (citation omitted). In other words, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87.

Finally, under AEDPA, the factual findings of state courts are presumed to be correct. See 28 U.S.C. §2254(e)(1); see also Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997). The petitioner must rebut this presumption by "clear and convincing evidence." 28 U.S.C. §2254(e)(1).

**B.** <u>**Interference with Right to Counsel of Choice**</u>

In her first claim for habeas relief (Ground One), petitioner asserts that her Sixth Amendment right to counsel of her choice was violated as a result of Investigator Becerra's interactions with Gloria Magnetti. Petitioner raised this claim on direct appeal (Exh. G, at 23-34); the Second Department denied the claim on its merits. See People v. Magnetti, 78 A.D.3d 863, 910 N.Y.S.2d 367.[17] Accordingly, on habeas review, I must apply the deferential AEDPA

---

[17] The Second Department's written decision on petitioner's direct appeal represents the last-reasoned state court decision to address the instant habeas claims.

review standard in evaluating petitioner's Sixth Amendment claim.  See Sellan, 261 F.3d at 312.

In *Weatherford v. Bursey*, 429 U.S. 545 (1977), the Supreme Court held that governmental intrusion into the attorney-client relationship violates the Sixth Amendment if the defendant can demonstrate that he was prejudiced by the intrusion.  In that case, an undercover agent (Weatherford) was arrested and indicted along with the defendant (Bursey) in order to maintain the agent's cover.  Under the belief that the agent was a co-defendant, he was included in the defendant's trial preparation sessions.  Weatherford testified for the prosecution at trial, and Bursey was convicted.  Bursey then sued Weatherford under 42 U.S.C. § 1983 on the ground that the agent had communicated defense strategy to the prosecution in violation of Bursey's Sixth Amendment right to counsel.  The district court entered judgment in favor of Weatherford upon the finding that "[a]t no time did Weatherford discuss with or pass on to his superiors or to the prosecuting attorney or any of the attorney's staff any details or information regarding the plaintiff's trial plans, strategy, or anything having to do with the criminal action pending against plaintiff."  Id. at 548 (internal quotation marks and citation omitted).  On appeal, the Fourth Circuit reversed and held that "whenever the prosecution knowingly arranges and permits intrusion into the attorney-client relationship the right to counsel is sufficiently endangered to require reversal and a new trial."  Id. at 549 (internal quotation marks and citation omitted).  The Supreme Court reversed the Fourth Circuit, noting the district court's "express finding that Weatherford communicated nothing at all to his superiors or to the prosecution about Bursey's trial plans or about the upcoming trial" and therefore reasoned that there had been "no substantial threat to Bursey's Sixth Amendment rights."  Id. at 556.  The Court also emphasized the absence of intentional misconduct and the legitimate law enforcement interests at stake:

Moreover, this is not a situation where the State's purpose was to learn what it

22

> could about the defendant's defense plans and the informant was instructed to
> intrude on the lawyer-client relationship or where the informant has assumed for
> himself that task and acted accordingly. . . . Weatherford went, not to spy, but
> because he was asked and because the State was interested in retaining his
> undercover services on other matters and it was therefore necessary to avoid
> raising the suspicion that he was in fact the informant whose existence Bursey . . .
> already suspected.

Id. at 557.  Thus, *Weatherford* did not decide the issue of whether a Sixth Amendment violation

requires a showing of prejudice where the governmental intrusion into the attorney-client

relationship was intentional and lacked any legitimate governmental purpose.

Here, in its decision denying petitioner's motion to dismiss the indictment, the

Westchester County Supreme Court (Molea, J.) found, as fact, that Becerra had engaged in a

"persistent campaign of telephone and personal communications with Gloria Magnetti . . . in an

attempt to utilize her to persuade her daughter to cooperate with the People in their prosecution

of her co-defendant by agreeing to testify against her at trial in exchange for a plea bargain."

Exh. E at 8.  Although the trial court held that Becerra's actions were "undeniably inappropriate

and objectionable," petitioner's motion was denied because the court was unable "to identify any

resultant prejudice flowing from the actions of Investigator Becerra" to petitioner.  Id. at 17.

Presuming the correctness of the trial court's factual findings, see 28 U.S.C. §2254(e)(1), it

appears that Becerra acted intentionally and without any legitimate governmental purpose.

Further, the trial court's conclusion regarding the lack of prejudice to petitioner was not "based

on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."  28 U.S.C. § 2254(d)(2).  I agree with the trial court as to the lack of prejudice:

there is no record evidence that petitioner suffered any prejudice as a result of Becerra's conduct.

Indeed, despite Becerra's persistent efforts, petitioner did not cooperate at any time, in any

manner, with the prosecution.  Thus, the issue presented on habeas review in this case is the very

23

issue left aside by *Weatherford*:   Assuming Becerra intentionally, and without any legitimate governmental purpose, interfered with petitioner's attorney-client relationship, must petitioner demonstrate prejudice in order to establish a Sixth Amendment violation?

In *United States v. Morrison*, 449 U.S. 361, 364 (1980), the Supreme Court specifically left open the question of whether, absent proof of prejudice, an intentional and unjustified governmental intrusion upon the attorney-client relationship may violate the Sixth Amendment. In *Morrison*, the defendant retained counsel after she was indicted on drug charges. Id. at 362. Thereafter, federal law enforcement officials sought to obtain defendant's cooperation in a related investigation and met with her outside the presence of her attorney (despite knowing that she had been indicted and retained counsel). Id. In the course of their meeting, the agents made disparaging remarks about defendant's counsel and indicated that defendant would face a stiff jail term if she did not cooperate. Id. Defendant declined to cooperate and continued to rely upon the services of her retained counsel. Id. at 362-63. Defendant thereafter moved to dismiss her indictment with prejudice on the ground that the agents' conduct violated her Sixth Amendment right to counsel. Id. at 363. The district court denied the motion; the Third Circuit Court of Appeals reversed, holding that defendant's Sixth Amendment rights had been violated and that dismissal of the indictment was the appropriate remedy. Id. Before the Supreme Court, the government argued that there could be no Sixth Amendment violation absent some showing of prejudice. Id. at 364. The Court specifically declined to reach that issue because it found, in any event, that dismissal of the indictment was an inappropriate remedy in the absence of demonstrable prejudice to defendant (or substantial threat thereof), even assuming that the Sixth Amendment was violated under the circumstances of the case. Id. at 364-65.

The Supreme Court most recently discussed a defendant's violation of his right to

counsel of his choice in *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006).  In that case, the district court denied defendant's retained counsel-of-choice *pro hac vice* admission, based in part upon an erroneous interpretation of the Missouri Rules of Professional Conduct.  Id. at 142-44. Before the Supreme Court, the government conceded that the district court deprived defendant of his choice of counsel but argued that "the Sixth Amendment violation is not 'complete' unless the defendant can show that . . . substitute counsel's performance was deficient and the defendant was prejudiced by it."  Id. at 144.  The Court rejected this argument and held that an "erroneous deprivation of the right to counsel of choice" constitutes a structural error mandating reversal of a conviction, without a further showing of prejudice.  Id. at 150.

Thus, *Gonzalez-Lopez* settled the question of whether the deprivation of the right to counsel of one's choosing was subject to harmless error analysis, but did not define the parameters–outside of the narrow fact pattern presented in that case–of what constitutes an "erroneous deprivation."  See United States v. Hashmi, 621 F. Supp.2d 76, 83-84 (S.D.N.Y. 2008) ("A careful reading of *Gonzalez-Lopez* demonstrates that it is a case more about harmless error review than about defining the content to the right to counsel of choice.").  Further, the facts of the case at bar are easily distinguished from those in *Gonzalez-Lopez*.  There, the government *conceded* that the trial court erroneously deprived defendant of his right to counsel of his choosing.  Gonzalez-Lopez, 548 U.S. at 144.  Accordingly, the sole issue before the Court was what level of prejudice, if any, must be shown *once it is determined that an erroneous deprivation of counsel has occurred*.  Here, the government makes no such concession.  Further, *Gonzalez-Lopez* addressed the trial court's erroneous disqualification–*i.e.* direct, absolute deprivation on its face–of defendant's choice of counsel.  Id. at 142-44.  The case at bar does not involve a facially direct and absolute deprivation; rather, the issue is whether Becerra's *indirect*

25

*interference* with the attorney-client relationship constituted an "erroneous deprivation" of petitioner's right to counsel of her choice.

In sum, there is no Supreme Court precedent directly on point which governs the issue at bar. Accordingly, under the AEDPA's deferential review standard, petitioner has failed to demonstrate that the Second Department's rejection of her Sixth Amendment claim was contrary to, or an unreasonable application of, *clearly established* Supreme Court precedent. I therefore conclude and respectfully recommend that petitioner is not entitled to habeas relief based upon her Sixth Amendment claim.

## C.    <u>Challenges to Evidentiary Rulings</u>

Petitioner contends she is entitled to habeas relief based upon two allegedly erroneous evidentiary rulings. In her second claim for habeas relief (Ground Two), petitioner argues that the trial court erred in refusing to admit into evidence the audiotapes of Investigator Becerra's conversations with Gloria Magnetti. In her third claim for habeas relief (Ground Three), petitioner argues that the trial court erroneously allowed the prosecution to introduce crime scene evidence. Petitioner raised both claims on direct appeal; the Appellate Division rejected them both on their merits. <u>See</u> <u>People v. Magnetti</u>, 78 A.D.3d 863, 910 N.Y.S.2d 367. Accordingly, on habeas review, I must apply the deferential AEDPA review standard in evaluating petitioner's evidentiary claims. <u>See</u> <u>Sellan</u>, 261 F.3d at 312.

It is well-settled that "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." <u>Taylor v. Curry</u>, 708 F.2d 886, 891 (2d Cir. 1983). A petitioner seeking habeas relief from an allegedly erroneous evidentiary ruling must "show that the error deprived her of a fundamentally fair trial." <u>Id.</u> <u>See</u> <u>also</u> <u>Zarvela v. Artuz</u>, 364 F.3d 415, 418 (2d Cir.2004) ("Even erroneous

evidentiary rulings warrant a writ of habeas corpus only where the petitioner can show that the error deprived him of a fundamentally fair trial.") (internal quotation marks and citation omitted). Thus, in evaluating a habeas petitioner's challenge to a state court's evidentiary ruling, a habeas court should engage in a two-part analysis, examining (1) whether the trial court's evidentiary ruling was erroneous under New York State law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial. See Perez v. Phillips, 210 F.App'x 55, 57 (2d Cir. 2006); Wade v. Mantello, 333 F.3d 51, 59 (2d Cir. 2003). As set forth below, this Court has reviewed the trial court's evidentiary rulings to which petitioner objects under this two-part test and concludes that petitioner's evidentiary claims lack merit.

1.   *Preclusion of Audiotapes*

At trial, petitioner's counsel sought to admit the audiotapes of the conversations between Investigator Becerra and Gloria Magnetti in order to prove that petitioner's July 30, 2006 statement to Becerra (in the diner) was coerced. Defense counsel conceded all the tapes were made post-July 30, 2006, but argued that they were relevant because the pressure exerted by Becerra was part of a continuous chain, which began in May 2006 and ended in June 2007. The trial court precluded admission of the tapes on the ground that "the post July 30th tapes [were] not relevant to the coercion before July 30th." (T. 1874-75).

"Trial judges have considerable discretion in making evidentiary determinations, and absent a serious abuse of that discretion, deference to the trial judge's decision is due." Heslop v. Artus, No. 08-CV-1105, 2012 WL 6553399, at *8 (N.D.N.Y. Mar. 22, 2012).[18] Petitioner has failed to demonstrate that the trial court's preclusion of the audiotapes constituted a serious

---

[18] Copies of all unpublished opinions and decisions available only in electronic form cited herein have been mailed to Petitioner. See Lebron v. Sanders, 557 F.3d 76, 78 (2d Cir. 2009).

abuse of discretion.  Under New York law,

> [t]he right to present a defense does not give criminal defendants carte blanche to
> circumvent the rules of evidence.  The courts therefore have the discretion to
> exclude evidence sought to be introduced by a defendant where such evidence is
> irrelevant or constitutes hearsay, and its probative value is outweighed by the
> dangers of speculation, confusion, and prejudice, or where such evidence is too
> slight, remote or conjectural to have any legitimate influence in determining the
> fact in issue.

People v. Williams, 94 A.D.3d 1555, 1556-57, 943 N.Y.S.2d 714, 716 (4th Dep't 2012) (internal

quotation marks and citations omitted).  In the case at bar, none of the audiotapes were recorded

prior to the statement at issue and, thus, were not directly relevant to the issue of whether

petitioner' statement was coerced.  Further, any potential relevance (as defense counsel argued,

to demonstrate a continuous chain of coercion) is outweighed by the potential to invite

speculation or mislead or confuse the jury.  Thus, petitioner fails to demonstrate that the trial

court's preclusion of the audiotapes was erroneous.

　　　　Moreover, even assuming *arguendo* that the trial court's ruling was erroneous under New

York law, it did not deprive petitioner of her constitutional right to a fundamentally fair trial.

Erroneous omission of evidence will render a trial unfair only if the excluded evidence,

evaluated in the context of the entire record, "creates a reasonable doubt that did not otherwise

exist.'"  Perez, 210 F.App'x at 57 (quoting United States v. Agurs, 427 U.S. 97, 112 (1976)).

Here, although the trial court precluded the audiotapes, defense counsel was permitted to put the

coercion issue before the jury via the testimony of both participants in the conversations.  Before

the audiotape issue arose, Investigator Becerra testified on cross-examination about his direct

contact with petitioner leading up to the July 30th diner meeting, including testimony concerning

the genesis of his involvement in the Mery murder investigation, his (ultimately successful)

efforts to convince petitioner to meet with Ossining police and give them a statement, his

attempts to establish rapport with petitioner and earn her trust (which Becerra described as "grooming the witness") and his preparations for (and method of) tape recording the diner meeting (T. 1442-50, 1459-64, 1466-70 ).  Becerra also admitted on cross-examination that certain statements he made to petitioner during their July 30th diner meeting (prior to her statement) were untruthful, including his statement to petitioner that he was "one friend trying to help another" (T. 1487-90).  After the trial court ruled on the audiotape issue, defense counsel–with leave of the court–recalled Becerra and questioned him about his conversations with Gloria Magnetti.  Gloria Magnetti was later called as a defense witness, and she testified about her conversations with Becerra prior to July 30, 2006 and that she communicated the substance of most of those conversations to petitioner.

     The jury also heard the audiotape of the almost two-hour conversation between Becerra and petitioner on July 30, 2006 at the diner and, thus, had the opportunity to weigh petitioner's (and Becerra's) demeanor and tone. (T. 1384-89; 1417-20).  Finally, the trial court instructed the jury as follows (T. 2794-95):

     In this case, defendant contends her statement at the diner was the result of coercion by Investigator Becerra.
     In considering whether a statement was obtained by means of any improper conduct or undue pressure by law enforcement which impaired the defendant's physical or mental condition to the extent of undermining her ability to make a choice of whether or not to make a statement, you may consider such factors including, for example, the defendant's age, intelligence and physical and mental condition, the conduct of the investigator during his conduct with the defendant and her mother, whether the defendant was in custody or free to leave.
     I caution you, deceptive practices and uses are strategies commonly employed by police to solve crimes by soliciting statements from suspects.  These statements may not result in a finding of involuntariness unless the strategy was so fundamentally unfair as to render the statement involuntary.
     It is for you to evaluate and weigh the various factors to determine whether in the end a statement was obtained by means of any improper conduct or undue pressure which impaired the defendant's physical or mental condition to the extent of undermining her ability to make a choice of whether or not to make

the statement.

       If you find the statement was involuntarily made, you must forget it, strike it from your minds.  And the People have the burden of proving to you beyond a reasonable doubt it was, in fact, voluntarily made.

In sum, as the Court cannot discern a question of constitutional dimension raised by petitioner's claim that the audiotapes were erroneously precluded, she has failed to demonstrate that the Appellate Division's denial of her claim on the merits was either contrary to, or involved an unreasonable application of, clearly established federal law.  Accordingly, I conclude, and respectfully recommend, that petitioner's claim that the audiotapes were erroneously precluded provides no basis for habeas relief.

    2.    *Admission of Crime Scene Evidence*

Petitioner's counsel submitted a motion in limine seeking to preclude the prosecution from presenting crime scene evidence in exchange for petitioner's stipulation that Anne Trovato was convicted of the predicate homicide.  The trial court denied petitioner's motion, but noted that defense counsel could make specific objections during trial.

At trial, during proceedings off the record prior to the prosecution's introduction of the crime scene evidence, defense counsel confirmed that Anne Trovato would be called as a defense witness (T. 610, 1101-02).  Over the course of the next several trial days, the prosecution called numerous witnesses to testify about the details of the crime scene and Mery's cause of death (T. 760-93, 915-1101, 1124-1266, 1508-40, 1609-78, 1680-1728, 1818-65, 1882-1913, 1916-81).  Defense counsel did not object at trial to any of the specific crime scene or autopsy evidence.

Defense counsel called Anne Trovato (T. 2073, 2077-78), who testified as follows:[19]

---

[19] Trovato appeared with assigned counsel, who noted that Trovato wished to testify and answer all questions posed to her despite counsel's warning that it would be a serious mistake

On May 11, 2006, Trovato needed to take some bills to her mother's house, so petitioner drove Trovato to Ossining and dropped her off (T. 2094-95). Later that evening, around 7:30 p.m., petitioner picked Trovato up in Ossining and brought her back home (T. 2096). Petitioner took the baby into the bathroom while Trovato carried some gift bags upstairs for petitioner and put them in petitioner's room (T. 2097). The room was dim, and Artie came up behind Trovato and put his hand over her mouth:

> He held his hand over my mouth like this, and he says, he told me to be quiet, not to cry, not to scream, not to make a sound, and he put two Polaroids in front of my eyes very quickly, but he showed them to me where I only got a glimpse of them, and -- . . . I, I didn't know what they were. He said to me, be quiet and put these in front of my face, and he says to me, that's your mom. . . . I saw this, like roundish shape. I saw a white, must have been like the white rug of the house. I believe it was black, a dark black. But there was something round here, something black. There was just a white underneath, but there was a roundish shape like, something like, it looked like plastic in the shape of a ball. There was like something silver. It was like right, like below the plastic. I don't know. It was just very quick. He just put them right quick, and he told me that they were my mother, and I didn't want to believe it. I didn't know if he was playing a practical joke; I have no idea. . . . I could not actually study the photographs to say that that was actually my mother, because I couldn't see a face. (T. 2097-99).

Artie told Trovato that if she said anything, he would put a pillow over her daughter's face "and she wouldn't wake up." (T. 2100). Artie put two large, black garbage bags in petitioner's car and told Trovato to tell petitioner that it's garbage from the bathroom and just get rid of it (T. 2101-02). Artie told Trovato to take them to a dumpster in Scarsdale; petitioner drove Trovato there, and Trovato put the bags in the dumpster (T. 2102-03).

On direct appeal, petitioner argued that the trial court should have accepted her

---

and that, if subpoenaed, she should assert her Fifth Amendment right against self-incrimination (T. 2074, 2076). Trovato confirmed her desire to testify fully, that she had spoken to counsel about it and that she was satisfied with his representation (T. 2075-76). During cross-examination, however, Trovato invoked her Fifth Amendment right in response to questions regarding whether Anne went into Gloria's house on May 11, 2006 and what took place thereafter (T. 2343-2356).

stipulation that Anne Trovato committed the predicate homicide, granted petitioner's motion in limine and precluded the crime scene evidence. The Second Department rejected that claim on the following ground:

> The trial court correctly declined to compel the prosecution to accept the defendant's concession that the codefendant had committed the crime of murder in the second degree, a class A felony, an element of the crime of hindering prosecution in the first degree (*see* Penal Law § 205.65). As the defendant sought to admit to a historical fact relating to the crime charged, the prosecution could not be compelled to accept the concession. Thus, the prosecution was entitled to prove its case by "evidence of its choice" (*Old Chief v. United States*, 519 U.S. 172, 188).

People v. Magnetti, 78 A.D.3d at 863-64, 910 N.Y.S.2d 367 (internal citations omitted). Presently, as a basis for habeas relief, petitioner again argues that the trial court should have compelled the prosecution to accept petitioner's stipulation that Anne Trovato committed the murder in lieu of allowing the prosecution to introduce highly prejudicial and inflammatory crime scene evidence. The claim is meritless, however, because petitioner fails to demonstrate that the Second Department's rejection of the claim was contrary to, or an unreasonable application of, Supreme Court precedent.

Two of the crimes with which petitioner was charged (second degree criminal facilitation and first degree hindering prosecution) required the People to prove, as an element of the crimes, that Trovato murdered Patricia Mery. Generally, "the prosecution is entitled to prove its case by evidence of its own choice, or, more exactly, [ ] a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." Old Chief v. United States, 519 U.S. 172, 186–87 (1997). Thus, the prosecution was free to reject petitioner's stipulation and rely on its own choice of evidence to establish that Trovato committed the predicate murder. Defense counsel was free to object during trial to the

32

introduction of specific evidence on the ground that its inflammatory, prejudicial nature outweighed its probative value, yet defense counsel did not do so.  In any event, under New York law, crime scene evidence such as photographs or video is admissible "if they tend to prove or disprove a disputed or material issue, to illustrate or elucidate other relevant evidence, or to corroborate or disprove some other evidence offered or to be offered."  People v. Wood, 79 N.Y.2d 958, 960, 591 N.E.2d 1178, 1179, 582 N.Y.S.2d 992, 993 (1992) (internal quotation marks and citation omitted).  Moreover, such evidence should not be excluded merely because it "portray[s] a gruesome spectacle and tend[s] to arouse passion and resentment against the defendant," unless its sole purpose was to "arouse the emotions of the jury or to prejudice the defendant."  Id. at 960, 591 N.E.2d 1179-80, 582 N.Y.S.2d 993-94.  Here, petitioner relinquished any such argument when Anne Trovato testified and pointed the finger at Artie Walsh–which necessitated the prosecution's crime scene evidence aimed at proving Trovato committed the murder.  "Where allegedly prejudicial evidence is probative of an essential element in the case, its admission does not violate the defendant's right to due process."  Santana v. Brown, No. 09 Civ. 5176(JPO), 2013 WL 2641460, at *8 (S.D.N.Y. June 12, 2013) (internal quotation marks and citation omitted).  Finally, the Court notes that petitioner was acquitted of the most serious charge–criminal facilitation–which belies petitioner's assertion that the crime scene evidence was so inflammatory as to deprive her of a fair trial.  Accordingly, because petitioner has failed to demonstrate that the Appellate Division's decision was contrary to, or an unreasonable application of, clearly established federal law, I conclude and respectfully recommend that Ground Three of the instant petition provides no basis for habeas relief.

## IV. CONCLUSION

For the reasons set forth above, I conclude—and respectfully recommend that Your Honor should conclude—that the instant petition for a writ of habeas corpus should be denied in its entirety. However, because neither the Second Circuit nor the Supreme Court has addressed the specific Sixth Amendment issue presented here, I recommend that petitioner be granted a certificate of appealability limited to the following issue: where the government intentionally, and without any legitimate governmental purpose, interferes with the relationship between petitioner and retained counsel, must petitioner demonstrate prejudice in order to establish a Sixth Amendment violation of the right to counsel of choice?

Dated:   February 19, 2014
          White Plains, New York

Respectfully submitted,

Paul E. Davison, U.S.M.J.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days, plus an additional three (3) days, or a total of seventeen (17) days, from service of this Report and Recommendation to serve and file written objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Hon. Vincent L. Briccetti , at the Hon. Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.  See Caidor v. Onondaga County, 517 F.3d 601, 604 (2d Cir. 2008).

Requests for extensions of time to file objections must be made to Judge Briccetti.

A copy of this Report and Recommendation has been mailed to:

Carmela Magnetti
09-G-0001
Albion Correctional Facility
3595 State School Road
Albion, NY 14411

Carmela Magnetti
156 Foshay Avenue
Pleasantville, NY 10570[20]

---

[20] In an attempt to ascertain a current mailing address for petitioner, chambers contacted the Westchester County District Attorney's Office who, in turn, obtained the Pleasantville address from petitioner's Parole Officer.